UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No: 7:07-CV-61-F

OXFORD HOUSE, INC.;               )
HAROLD LAING                      )
            Plaintiffs            )
                                  )
        v.                        )          **ORDER**
                                  )
CITY OF WILMINGTON,               )
NORTH CAROLINA,                   )
            Defendant.            )

    This matter is before the court on Plaintiffs' Motion for Partial Summary Judgment [DE-22] and Defendant's Motion for Summary Judgment [DE-20]. The parties also have filed a joint Motion to Continue [DE-76] the trial and pretrial proceedings. The motions have been fully briefed and are ripe for disposition.

    Plaintiffs, Oxford House, Inc. and Harold Laing (collectively, "Oxford House"), brought this action against the Defendant, City of Wilmington, North Carolina ("the City"), to enforce the provisions of the Fair Housing Act, as amended, 42 U.S.C. § 3601, *et seq.* ("FHA")[1], the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* Oxford House alleges that the City violated the FHA by failing to grant Oxford House a "reasonable accommodation" when the City denied Oxford House's request for a zoning ordinance text amendment to permit Oxford House to operate two "large" group homes for recovering alcoholics and drug addicts in certain single-family residential districts where such homes are prohibited. In the Complaint [DE-1], Oxford House seeks

---

    [1]  The Fair Housing Amendments Act of 1988 ("FHAA"), P.L. 100-430, 102 Stat. 1619, amended the Fair Housing Act of 1968 to extend its coverage to housing discrimination on the basis of handicap and familial status. The core of the amended statute's provisions relating to housing discrimination on the basis of handicap appear in § 804(f), codified at 42 U.S.C.A. § 3604(f), which includes a subsection, 42 U.S.C.A. § 3604(f)(3)(B), making it unlawful to refuse to make reasonable accommodations to afford a handicapped person equal opportunity to use and enjoy a dwelling. For ease of reference, "FHA" as used herein encompasses the FHA and the applicable amendments.

injunctive relief, compensatory damages and attorney's fees. The City filed an Answer [DE-8], and demanded a trial by jury. After filing its motion for summary judgment, the City filed a Withdrawal of Request for Jury Trial [DE-29], and indicates the withdrawal is with Oxford House's consent.

The parties have filed cross-motions for summary judgment on the sole issue whether the City violated the FHA by refusing to grant Oxford House's "reasonable accommodation" request. In support of their respective motions, the parties separately have filed a Joint Record [DE-21, DE-23], a copy of which is attached to the parties' respective motions for summary judgment. The parties stipulate that the exhibits contained in the joint record constitute the complete evidentiary basis for this action. *See* [DE-21], Ex. 2 (Joint Record of the Parties). The parties do not dispute the authenticity of the documents comprising the Joint Record. Accordingly, for ease of reference, all factual citations herein are to Exhibits constituting the Joint Record appended to the Oxford House Memorandum at [DE-23] .

## I. STATEMENT OF THE FACTS

### A.     Oxford House, Inc.

Oxford House, Inc., is a non-profit corporation founded in 1975 that serves as the umbrella organization for a national network of Oxford House group homes that provide housing and rehabilitation for individuals recovering from alcoholism and drug addiction. Oxford House Memorandum [DE-23], Ex. C, Part 2, at p. 6. Congress provided for the establishment of a revolving funds loan program in order to provide federal monies to nonprofit private entities such as Oxford House under the alcoholism, drug addiction and mental health block grant funds. *See* 42 U.S.C. § 300x-25.

Individual Oxford Houses operate in a family atmosphere in which groups of recovering individuals rent a home to live together in a supportive environment of recovery from addiction. Each individual house obtains a charter from Oxford House, Inc. In order to secure a charter,

2

an individual house must meet three basic requirements: (1) it must be democratically self-run; (2) it must be financially self-supporting; and (2) it must immediately expel any resident who returns to using alcohol or drugs. An individual house also must consist of at least six persons. Oxford House represents that, in developing a system of operation, however, it has learned that an individual Oxford House with 8 to twelve residents provides the most effective therapy for recovering individuals.

The Oxford House model also requires operation in a residential neighborhood which is free from the outside influences that degrade recovery, such as the presence of drugs or alcohol, and which offers access to recovery programs like Alcoholics Anonymous and Narcotics Anonymous. Oxford House has developed this standardized system in an attempt to ensure that recovering individuals have the best opportunity to live a clean and sober life. Ex. C, Part 2, at pp. 6-9.[2]

It is well-established, however, and the court takes judicial notice of the fact, that Oxford House's typical method of establishing itself in a city consists of locating a house in a single-family neighborhood, obtaining a lease, and making the house as available to recovering alcoholics and drug addicts to live there according to the Oxford House model. It is not the practice of Oxford House initially to seek any permit required by local ordinances for operating a group home, because Oxford House considers residents of its homes to be a "family," notwithstanding definitions contained in local zoning ordinances. Therefore, a new Oxford House operates until it eventually is cited by the municipality for zoning or other local violation,

---

[2] This reference, provided by Oxford House, is to an undated document designated as Attachment A – apparently to Oxford House's Application for the text amendment – and entitled "Group Home Supportive Conditional Permit." It appears to be a standard document used by Oxford House to support applications for zoning permits and variances in North Carolina. It, in turn, cites the abstract of a 2001 article prepared by Oxford House's "expert," Dr. Leonard Jason ("Dr. Jason"), of DePaul University, who reports to have studied Oxford House operations for 14 years.

3

at which time Oxford House begins the local administrative process to obtain a special use permit or variance, or institutes a legal proceeding alleging failure to accommodate under federal law. In his concurring opinion in *United States v. Village of Palatine, Ill.*, 37 F.3d 1230 (7th Cir. 1994), Circuit Judge Daniel A. Manion wrote:

> The Oxford House is an organization with a lofty and impressive goal; it seeks to assist recovering alcoholics and drug abusers. That honorable goal, however, does not put the Oxford House above the law. Yet, the Oxford House has adopted a rather high-handed policy: "As a matter of practice, Oxford House, Inc. does not seek prior approval of zoning regulations before moving into a residential neighborhood." Apparently, the Oxford House believes that if members of the group move in quietly without notice it will be harder to evict them. This strategy is evident throughout this appeal.

*Id.* at 1234-35 (footnote omitted); *see also Oxford House-A v. City of University City*, 87 F.3d 1022, 1023 (8th Cir. 1996). Oxford House seems to have followed a similar pattern as to the subject homes, according to statements by Assistant City Attorney Delores M. Williams to the City's Planning Commission during the public hearing conducted on December 6, 2006. Exh. E, p. 22.

A review of some reported cases confirms also that Oxford House ordinarily does not seek an accommodation from the city before filing suit in federal court against the municipality for violation of the FHA, ADA and Section 504 of the Rehabilitation Act. Often, as here, the federal action will be dismissed as un-rip because Oxford House did not first exhaust its administrative remedies by seeking an accommodation. *See, e.g., Oxford House-A v. City of University City*, 87 F.3d 1022 (8th Cir. 1996); *Oxford House-C v. City of St. Louis*, 77 F.3d 249 (8th Cir. 1996); *Village of Palatine*, 37 F.3d at 1234; *Oxford House v. City of Wilmington*, No. 7:04-CV-134-FL (E.D.N.C. May 25, 2006) (hereinafter "*Oxford House I*"); *see also Tsombanidis v.City of West Haven, Conn.*, 129 F. Supp. 2d 136, 160-61 (D. Conn. 2001); *Oxford House, Inc. v. City of Virginia Beach, Va.*, 825 F. Supp. 1251, 1260-61, 1264 (E.D. Va. 1993) (differentiating between "exhaustion" and "ripeness," and holding that "plaintiffs' claim that the City's unrelated

4

persons restriction, as applied to them, violates the Fair Housing Act is not ripe for adjudication until plaintiffs apply for conditional use permits and afford the City an opportunity to act on those applications"); *but see United States v. Town of Garner*, ___ F. Supp. 2d ___, No. 5:09-CV-216-FL, 2010 WL 2541094, slip op. *7 (E.D.N.C. June 22, 2010) (Oxford House applied for text amendments on three occasions but Town never granted requested accommodation).

Usually, Oxford House will return to the state level and make proper application for accommodation through the correct administrative channels. If its proper request is denied, Oxford House returns to federal court, suing the city for violation of federal civil rights housing statutes, and seeking injunctive relief and attorney's fees. Oxford House followed this pattern with regard to the OH-Camden and OH-Market houses in Wilmington, North Carolina. *See* detailed account of Oxford House's methodology in *Oxford House I*.

## B.     **Wilmington Oxford Houses**

Since 1990, the State of North Carolina and Oxford House, Inc. have entered into annual contracts to establish a statewide network of Oxford Houses. Ex. C, Part 2, at p. 7. In July 1994, Oxford House established a home at 3528 Camden Circle in the City of Wilmington ("OH-Camden"), located in the single-family residential "R-15" District. Ex. B at p. 2. In June 1995, Oxford House opened another facility at 2803 Market Street ("OH-Market), located in the single-family residential "R-10" district. Ex. B at p. 2. Both houses are owned by individual plaintiff Harold Laing, and he has leased them to Oxford House residents continually from the date the homes were charted to the present. At the time the homes were established, neither "were in compliance with the City's [then-existing] Zoning Code" because, *inter alia*, neither home had obtained a special use permit required by that Code. Ex. B at p. 5.

5

## C. City enacts the LDC

On March 18, 2003, the City adopted new provisions to its Zoning Ordinance (now called the Land Development Code ("LDC")[3] to regulate group homes and other care facilities for the disabled. For persons with disabilities under the FHA or ADA, including individuals recovering from alcoholism and drug addiction, the new LDC provided for three categories of group homes supportive that are pertinent to the instant case: (1) in a "group home supportive small," up to six unrelated disabled persons may live together in a single family dwelling unit in any Residential or Historic district, with a special use permit in Commercial districts; (2) in a "group home supportive medium," up to eight unrelated disabled persons may live together in any Residential, Historic, Commercial or Mixed Use district; and (3) in a "group home supportive large," up to twelve unrelated disabled persons may live together in any Multi-Family Residential District (Low, Medium, or High) or in any Commercial district, and by a special use permit in the Historic District, the Historic District Mixed Use, and the Mixed Use District. Ex. A. Consequently, a group home supportive large is not allowed in any single-family residential zone.

Additionally, the LDC provided that a group home falling within any one of the foregoing categories (small, medium or large) may not be located closer than a half-mile from another group home, except there is no spacing requirement for group homes supportive small or

---

[3] Chief Judge Louise Flanagan, in *Oxford House I,* described the events that led to the enactment of the LDC. *See* Ex. B. To summarize, a non-Oxford House group home was cited for operating in violation of the Zoning Code. The owner of the group home complained that many other group homes were operating illegally in the city, and that the Zoning Code should be enforced fairly and equally, resulting in a city-wide investigation and citations being issued to both OH-Camden and OH-Market. The City formed a task force to study and update the City's zoning regulations to comply with the ADA and FHA. Over the course of nine months, eight public meetings were held to develop a new ordinance, and on March 18, 2003, the City Council unanimously adopted the new ordinance regulating group homes and other care facilities for the disabled.

6

medium located in any Multi-Family Residential or Commercial district or for group homes supportive large located in any Commercial district. Ex. A, at Sec. 18-287. The Ordinance also required that each group home obtain a certificate of occupancy, which is granted as a matter of right upon satisfaction of certain prescribed conditions, such as compliance with the Minimum Housing Code, off-street parking requirements, and architectural compatibility of new construction with the existing streetscape. Ex. F., Part 1, at pp. 9-10, 20; Ex. A, at § 18-286.

## D. Enforcement of the LDC and the first federal action

Shortly after the LDC provisions became effective in 2003, the City sent "Notice of Violation" letters to over twenty group homes that had been operating unlawfully under the old Ordinance, including four Oxford Houses: the OH-Camden and OH-Market homes, and the OH-Covil and OH-Smith Creek homes. Both OH-Covil and OH-Smith Creek brought themselves into compliance with the LDC, but the OH-Camden and OH-Market homes violated the half-mile separation requirement because of their proximity to two other group homes that also submitted permit applications to operate in the area. Ex. F, Part 1, at p. 11. To resolve that situation, the City had the four houses in violation of the separation restriction engage in a random drawing to determine which would be granted permits. Both the OH-Camden and OH-Market homes lost the lottery and their applications were denied. Ex. F, Part 1, 11-12.

Oxford House then sought a "reasonable accommodation" under the FHA and ADA from the City's Board of Adjustment through a request for a variance from the half-mile separation requirement to operate the OH-Camden and OH-Market homes as group homes "medium." The Board denied the request, and the denial was affirmed on Oxford House's appeal to the New Hanover County Superior Court. Ex. B, at p. 8.

Oxford House then filed a new application with the City, this time abandoning its effort to have the OH-Camden and OH-Market homes approved as "medium group homes," and revising its request to seek "group homes supportive *large*" designation to permit between nine

7

and 12 unrelated disabled persons to live in each home. Ex. B, at p. 8; Ex. C, Part 1, at pp. 19-20. The City informed Oxford House that because the LDC did not permit group homes "large" under any circumstances in the R-15 and R-10 single family residential districts, Oxford House would have to seek approval from the City Counsel of a text amendment to the LDC. Ex. F, Part 1, at p. 12. Rather than do so, however, Oxford House instituted *Oxford House I* in this court on June 30, 2004, challenging the LDC, the lottery, and the City's refusal to grant a reasonable accommodation as violating the FHA, ADA and the Rehabilitation Act, as well as the equal protection and due process clauses of the United States Constitution.

On May 25, 2006, Chief Judge Flanagan issued an order ruling on the parties' cross-motions for summary judgment in *Oxford House I*. That order upheld the lottery and most of the provisions of the LDC. Chief Judge Flanagan dismissed without prejudice Oxford House's claims that the City failed to grant a reasonable accommodation regarding the permit applications to operate OH-Market and OH-Camden as "group home supportive large uses." The court held that the "large" applications were not ripe for adjudication because Oxford House and the other plaintiffs had not exhausted their administrative remedies as to that designation. Specifically, the court found that Oxford House failed to pursue a text amendment of the LDC. *See generally Oxford House I*, No. 7:04-CV-134-FL(1) (E.D.N.C. May 25, 2006). Exh. B.

### E. Text amendment application

Oxford House returned to the City and submitted applications for "group home supportive large" permits for both OH-Camden and OH-Market, and applied for a text amendment of the LDC. Ex. C. Part 1, at p. 18. The proposed text amendment would allow the OH-Camden and OH-Market homes to operate as large group homes in their existing locations in the R-15 and R-10 single-family residential districts, but would not allow any other group home large to be located in that or any other R-15 or R-10 district. Specifically, the text

8

amendment application sought the following amendments to the LDC:

> Add the following language to both Sections 18-178. R-15 and 18-878. R-10 of
> Chapter 18, Article 5, Division II:

> "Notwithstanding anything to the contrary in this Code, the properties located at
> 3528 Camden Circle and 2803 Market Street are allowed to operate as "group
> home supportive large" uses as long as the homes are chartered members of
> Oxford House, Inc. and are operated consistent with the Oxford House, Inc.
> model for persons recovering from alcoholism and/or drug addiction."

Ex. C, Part 2, at p. 16. Thus, the proposed text amendment sought an accommodation not only

to eliminate the prohibition against "group homes supportive large" in a residential district, but

also to circumvent the one-half mile spacing requirement,[4] as to OH-Camden and OH-Market,

only.

In support of its applications, Oxford House submitted a packet of materials, including

the following "Explanation of the Impacts on the City as a Whole" and statement of the

amendment's "Consistency with City's Plans and Policies": [5]

> Explanation of Impacts on the City as a Whole:

> Adoption of the proposed text amendment will have no impact on the City
> as a whole. The Oxford House at Camden Circle has been in existence and
> continuous operation for over twelve years, since 1994. The Oxford House on
> Market Street has been in existence and continuous operation for over eleven
> years, since 1995.

> These two Oxford Houses have served the City without incident, and
> without any financial or administrative burden to the City. During this time
> these Oxford Houses have provided a home to and facilitated the recovery of over

---

[4] Oxford House notes that OH-Camden is located within .439 miles of another group
home supportive, and OH-Market is located within .171 miles of another group home
supportive.

[5] The authorship of these documents and the source of the representations contained
therein is not revealed, although John Fox of Oxford House executed the amendment
application, which designated attorney Gregory Heafner as Oxford House's agent for purposes
of the proceedings. Dr. Jason's report, also contained in the collection of materials submitted
by Oxford House in this litigation, is its sole source of "evidence"supporting its application for a
text amendment and its contention that the City failed to provide a reasonable accommodation in
violation of the FHA.

9

an estimated one hundred individuals recovering from alcoholism and or drug addiction. These two Oxford Houses have conferred an invaluable benefit, free of charge to the City, for over a decade. The proposed text amendment seeks to allow the continuation of this benefit and the continued operation of these two Oxford Houses. The proposed text amendment affects only the two Oxford Houses located at 3258 Camden Circle and 2803 Market Street.

### Consistency with City's plans and policies

The proposed amendment is consistent with the City's plans. Oxford Houses are permitted uses under the City's code as "Group Home Supportive." The Code permits these types of uses which provide housing for recovering alcoholics and drug addicts.

The proposed amendment is also consistent with the City's policies. The City maintains a stated policy in its Code to allow for a reasonable accommodation pursuant to the Federal Fair Housing Act to disabled persons such as those residing in an Oxford House. Oxford House operates a unique program that is not the same as other providers of community based residential care for persons recovering from alcoholism and/or drug addiction. Although there are "group homes" operating in the City, because Oxford House offers a unique program these other "group homes" do not provide the ameliorative benefit that Oxford House provides. Based on thirty years of experience and over one thousand homes across the country, Oxford Houses with 8 to 12 residents have proven to provide the optimal ameliorative benefit for their residents. Finding a home of the necessary size is a challenge in the City. Not all homes available for rent in the City are able to accommodate this number of residents. The properties located at Camden Circle and Market Street are uniquely qualified in this respect, and the proposed text amendment only affects these two properties.

Ex. C. , Part 2, at unnumbered p. 17.

The text amendment application also contained other information, including descriptive

materials about the Oxford House model and the "opinion" of Dr. Jason. *See* Ex. C, Part 2, at

pp. 18-42. Dr. Jason expressed his impressions of the efficacy of Oxford Houses, generally,

their impact on the community, and how characteristics of the Oxford House model relate to the

therapeutic benefits for and needs of its residents.

## F. The application process

The City's text amendment application process entailed two public hearings: the first

before the City's Planning Commission, and the second before the City Council. The Planning

10

Commission's role was to make a recommendation to the City Council, to either grant or deny the application. The City Council's role was to make the final decision on the application. At the respective hearings, the Planning Commission and the City Council members had before them the materials described above, and they heard from Oxford House's lawyer, the City's staff, and members of the public.

On December 6, 2006, the Planning Commission voted 7-0 to recommend denial of the application. On January 9, 2007, the City Council also voted unanimously to deny the application.

The format and evidence at both hearings essentially were the same. Oxford House's attorney summarized his contentions on behalf of the OH-Camden and OH-Market homes. The City staff presented a "Case Summary," which concluded with the recommendation that the text amendment be denied. A handful of residents primarily from the respective neighborhoods spoke in opposition to the amendment at each hearing. Members of the Planning Commission and the City Council asked questions and offered observations and opinions.

## G. The parties' positions

(1) Oxford House

Most importantly, Oxford House contends that the burden of proof in this FHA lawsuit is the City's to carry. Oxford House explains that the City has failed to do so.

The record before the court indicates that Oxford House argued that its proposed amendment is "necessary" because:

- There is a demonstrated and proven therapeutic need for allowing the requested nine residents in the Oxford Houses. Ex. C Part 2, p. 18-42; Ex E, pp. 4:8-19; Ex. H, pp. 9:25-10:8.

- There "is a financial benefit to having more residents". . . . "because if the residency drops low because of normal vacancies" in a smaller house, "the house isn't going to function as well monetarily because they're self-supporting." Ex. H, pp. 10:14-11:-2.

11

- Without the amendment, OH-Market and OH-Camden would have to close, causing the residents to lose their homes. The closure would work a hardship on each resident because Oxford House cannot guarantee a new home to each resident. According to Oxford House, some of the residents would likely relapse, resulting in harmful consequences, including death. Ex. E, at pp. 10:22-11:14, 14:10-15:1-5; Ex H, at pp. 11:15-19.

- The need extends not only to the present residents, but also to future residents. Ex. E, at p. 14:13-15; Ex. H, at pp. 9:16-23.

With regard to the "reasonableness" of the amendment, Oxford House pointed out that:

- The proposed text amendment is worded in a manner to ensure that it affects only the OH-Market and OH-Camden properties. Ex. E, at p. 6:8-18; Ex. H, p. 8:3-6.

- The amendment is limited to these two specific properties as they currently are used. If Oxford House ceases to operate at either property, no other person or entity could take advantage of amendment. *Id.*

- Therefore, the text amendment is designed not to be "precedent setting." *Id.*

- Oxford House is not seeking a new use of these properties, but rather seeks to continue the same use of the properties it has made of them over the past decade. Ex. E, at p. 7:2-12; Ex. H, P. 8:3-6.

The court notes that the first, second and third points are the same.

Furthermore, Oxford House argued that the amendment is reasonable in that it would

create "no financial burden" on the City or "fundamentally alter the City's zoning scheme."

Specifically, it explained:

- Each Oxford House has been its present location for eleven and twelve years respectively. Ex. E, at p. 6:19-21; Ex. H at p. 7:22-25.

- Each Oxford House confers a benefit on the City by providing free of charge to the City housing to men recovering from alcoholism and or drug addiction. Ex. E at p. 7:16-18; Ex. H at p. 9:16-23.

- Both Oxford Houses pre-date the 2003 LDC. Ex. E at p. 7: 6-9; Ex. H, at p. 7:5-25.

The first and third points are the same, and are the same as the fourth "reasonableness" point,

above. Except for the "free benefit" point, Oxford House's "reasonableness" argument can be

12

distilled to the following proposition: the two subject Oxford Houses have been operating illegally in their present locations in violation of the half-mile proximity restriction, and housing nine or more residents for over ten years, so the requested accommodation *must* be reasonable.

(2) The City

The City, relying on Fourth Circuit precedent, contends that the burden of proof is on the plaintiffs – Oxford House – and explains that Oxford House has failed to demonstrate that it can produce evidence to support the three essential elements of its FHA claim. The City points out that the two residences at issue here always have been in violation of the City's zoning ordinances and codes, and that the undisputed facts of this case show Oxford House cannot prevail.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Essentially, "the moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

This civil rights action is an original action, filed pursuant to federal statutes and is not an appeal from an administrative proceeding. Both parties have filed motions under Fed. R. Civ. P. 56 for summary judgment. The types of materials appropriate for consideration in summary judgment analyses generally are presented under oath, and they include "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." FED. R. CIV. P. 56 (c); *Celotex Corp.*, 477 U.S. at 323

The parties' "Joint Record," which they stipulate constitutes the sole factual basis for their respective motions, contains no "depositions, answers to interrogatories, . . . admissions

13

on file, . . . or affidavits." Neither the Complaint [DE-1] nor the Answer [DE-8] is sworn. Indeed, the Joint Record contains little, if any, "evidence" of the nature and quality upon which a fact-finder generally would be required to render a verdict.

The court construes the parties' stipulation in this case to be an admission of the authenticity of documentary materials contained in the administrative record, *see Lewis v. Draper City*, ___ F. Supp. 2d ___, No. 2:09-CV-589-TC, 2010 WL 3791404, slip op. at *4 & n.3 (D. Utah Sept.22, 2010); *Tillery v. Borden*, No. CIV.A. CBD-07-1092, 2010 WL 2132226 (D. Md. May 25, 2010), and of the fact that neither party can (or wishes to) produce anything else to support its position. The absence of competent evidence upon which to base a summary judgment ruling has not, however, hindered other courts in this context, and the undersigned will not belabor the point.[6]  *But see Jama Investments, L.L.C. v. Incorporated County of Los Alamos*, No. CIV 04-1173 JB/ACT, 2006 WL 1228771, slip op. at *12 (D.N.M. Feb. 16, 2006) (UP) (concluding that the district court "may consider any evidence that the parties submit so long as that evidence conforms to the Federal Rules of Evidence; its review of the Defendants' actions are not circumscribed by what occurred in the legislative proceedings before this lawsuit commenced); *see Evans v. UDR, Inc.*, 644 F. Supp. 2d 675, 677, n.3 (E.D.N.C. 2009) (noting that an unsworn affidavit presented on motion for summary judgment in an FHA "reasonable accommodation" case not treated as sworn testimony).

## III. ANALYSIS

In its examination of the law of necessary and reasonable accommodation and zoning codes, the Fourth Circuit has stated the following:

> In enacting the FHA, Congress clearly did not contemplate abandoning the deference that courts have traditionally shown to such local zoning codes.

---

[6]  Moreover, where, as here, the party seeking accommodation elects to forego an appeal of the municipal tribunal's decision, that party is bound by the tribunal's findings. *See Bryant Woods Inn, Inc. v. Howard County, Md.*, 124 F.3d 597, 604 (4th Cir. 1997).

14

And the FHA does not provide a "blanket waiver of all facially neutral zoning policies and rules, regardless of the facts," *Oxford House, Inc. v. City of Virginia Beach*, 825 F. Supp. 1251, 1261 (E.D. Va. 1993), which give the disabled "carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary." *Thornton v. City of Allegan*, 863 F. Supp. 504, 510 (W.D. Mich. 1993). Seeking to recognize local authorities' ability to regulate land use and without unnecessarily undermining the benign purposes of such neutral regulations, Congress required only that local government make "reasonable accommodation" to afford persons with handicaps "equal opportunity to use and enjoy" housing in those communities. 42 U.S.C. § 3604(f)(3)(B).

*Bryant Woods*, 124 F.3d at 603. Accordingly, the FHA "requires an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing." *Id.* (citing 42 U.S.C. § 3604(f)(3)).

There is no dispute among the federal courts that the plaintiff bears the burden of proving the "necessity" of a requested accommodation. However, a circuit split exists as to which party has the burden of proof as to "reasonableness." In *Bryant Woods*, the Fourth Circuit determined, with little discussion, that the plaintiff bears the burden of proving each of the elements by a preponderance of the evidence. *See id.* at 603-04 ("Because the FHA's text evidences no intent to alter normal burdens, the plaintiff bears the burden of proving each of these three elements by a preponderance of the evidence") (citing *Elderhaven v. City of Lubbock*, 98 F.3d 175, 178 (5th Cir. 1996)). Likewise, the Sixth Circuit Court of Appeals concluded that "the plaintiff in a Fair Housing Act case has the burden of proof to establish the reasonableness of a proposed accommodation." *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1045 (6th Cir. 2001); *accord Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002).

The Third Circuit in *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996), however, held that "the burden should have been placed on the [defendant] [t]ownship . . . to prove that it was either unable to accommodate [the plaintiff] or that the accommodation . . . proposed was unreasonable." In doing so, *Hovsons* relied on precedent interpreting § 504 of

15

the Rehabilitation Act. *See, e.g., Juvelis v. Snider*, 68 F.3d 648, 653 & n. 5 (3d Cir. 1995). Finding it was bound by *Hovsons* concerning the burden to prove reasonableness, the Third Circuit Court of Appeals held in *Lapid-Laurel, L.L.C. v. Zoning Bd. Of Adjustment of Township of Scotch Plains*, 284 F.3d 442 (3d Cir. 2002), that "a burden-shifting approach in which the plaintiff would first have the burden of demonstrating that the requested accommodation is necessary to create an equal opportunity, at which point the burden would shift to the defendant to show that the accommodation is unreasonable, makes sense from a policy standpoint." *Id.* at 458.

This court is bound by the Fourth Circuit's declaration that the plaintiff bears the burden of proving all three elements of its FHA failure to accommodate claim by a preponderance of the evidence. *Bryant Woods*, 124 F.3d at 604.

## A. Unchallenged half-mile separation restriction

As described above, upon enactment of the LDC both Oxford House homes were located within the reduced half-mile radius of two other group homes. In its attempt to reach a fair resolution, the City conducted a neutral lottery to determine which two of those four non-complying group homes would be permitted to remain. Both these Oxford Houses homes lost to the other two homes. Notwithstanding the lottery result, these Oxford Houses remain in non-compliance. Oxford House does not deny these facts; it simply has chosen not to draw attention to them.

Since 2003, the one-half mile proximity restriction repeatedly has been upheld against Oxford House's challenges. The City's Planning Board, the Superior Court in New Hanover County, North Carolina, and Chief U.S. District Judge Louise W. Flanagan[7] have rejected Oxford

---

[7] Judge Flanagan held that "collateral estoppel operates to preclude plaintiffs from re-litigating the issue of whether [the City] denied them a reasonable accommodation from the half-mile separation requirement with respect to a group home supportive medium." *Oxford House I*, No. 7:04-CV-134-FL(1) at p. 40.

House's efforts to avoid lift the proximity restriction. Whether an Oxford House is characterized as "small" (up to six residents), "medium" (up to eight residents), or "large" (up to 12 residents), it may not be located in any single-family residential district within one-half mile of another group home of any size in any single-family residential district. *See* Exh. F, Part 1, at pp. 9-10, 20; Exh. A at §§ 18-178 & -18-179. The viability of the one-half mile proximity restriction was not a focus of the most recent round of municipal hearings, and is not a point of contention in this litigation. Oxford House has offered no new evidence why it is "necessary" or "reasonable" that the Camden and Market Street Oxford Houses be permitted to continue operating illegally within one-half mile of other group homes, in disregard of the outcome of the City's lottery and in continued violation of the LDC.

The LDC's approved half-mile separation requirement prevents either Oxford House from being eligible for a certificate of occupancy, regardless of the number (above three) of unrelated recovering alcoholics and drug addicts living there. Because compliance with the LDC has both a proximity and an occupancy component, failure to satisfy either defeats the effort.

Even absent the Houses' violation of the separation requirement and their failure to advance any reason for waiving it, Oxford House has failed to demonstrate that it could prove, by a preponderance of the evidence, that "necessity" and "reasonableness," as those terms are used in the FHA, require the City to enact a text amendment to its LDC as an accommodation to these two consistently non-compliant group homes.

## B. "Necessity"and "Reasonableness"

(1) "Necessity"

Oxford House insists throughout its various memoranda that the City has the burden of proof in the "reasonable accommodation" analysis. As noted above, the Fourth Circuit Court of Appeals has stated otherwise. *Bryant Woods*, 124 F.3d at 603-04. The only "evidence" offered by Oxford House in its pursuit of an accommodation is Dr. Jason's report which, although

17

purportedly prepared specifically for this litigation, *see* Plaintiffs' Memorandum [DE-23] p. 17, includes no observations of either the Camden or the Market Street Oxford House. In fact, the only mention of Wilmington, North Carolina, in Dr. Jason's report is contained in the introductory sentence thereto: "Thank you for this opportunity to present my expert report for the current court case involving an [sic] Oxford House in Wilmington, North Carolina." Exhibit C, Part 2, Jason's Report.

Stripped of its rhetoric and unsupported declarations, Oxford House's theory of "necessity" is this: in terms of maximum resident capacity in Oxford House homes, "more is better." Here, the "evidence" Oxford House proffers in support of its burden to show the necessity of the proposed text amendment accommodation consists of Dr. Jason's report and the statements of Oxford House's counsel, Mr. Heafner.

Dr. Jason's opinion is that the accommodation (permitting occupancy by nine to 12 residents and waiving the half-mile radius restriction) is "necessary" because the greater the number of residents per house, the lighter the financial burden on each and the greater the opportunity for "counseling" and peer support. In its entirety, the substance of Dr. Jason's report purporting to address an accommodation is as follows:

> Oxford Houses with 9 or more residents have several advantages over limiting the size to 8 or fewer residents. As you would expect, with more individuals in an Oxford House, it is easier for the members to pay the rent as there are more people to split the cost of the monthly rent. Typically, residents of Oxford House do not have the financial means to pay for the cost of living and rent on their own due to the stage of their addiction when they became a resident of Oxford House, so need to pool these resources from a larger group. In addition, having more individuals allows members to learn from each other, and the more people with different types of backgrounds, the great ability for benefits from diversity. In our national data set, we found that larger houses establish themselves longer, suggesting that larger houses are more stable over time. Compared to smaller houses (8 or fewer members), individuals living in larger Oxford Houses (9 or more members) spent more time working; spent more time in school or in training; were less likely to be on parole or probation; had fewer charges of disorderly conduct, vagrancy, or public intoxication; spent less time in jail; reported less lying, stealing, fighting; had fewer problems controlling violent behavior; reported fewer psychiatric, psychological, or emotional problems; had

18

less severe alcohol or drug problems before moving into an Oxford House; and had longer lengths of cumulative sobriety. Overall, these findings indicate that compared to smaller houses, residents of larger Oxford Houses are better adjusted and more productive members of society. With larger number of residents in houses, Oxford House residents are more likely to get the types of therapeutic benefits that they need.

Ex. C, Part 2, p. 1. The remainder of the report extols the Oxford House model, generally.

Except for the single introductory sentence mentioning "an" Oxford House in Wilmington, North Carolina, Dr. Jason's report and the opinions contained therein are generic to the Oxford House model, and purport to be based on eight publications dated between 1988 and 2006, in three of which he is listed as an author, and none of which purports to examine the "necessity" of nine or more residents living in an Oxford House home for purposes of justifying an accommodation or variance from a Wilmington, North Carolina, zoning code or ordinance. After studying Oxford House operations for 14 years, Dr. Jason was able to express the "professional opinion" that "Oxford Houses with more residents can provide more sustainable therapeutic benefits and can remain financially viable." *Id.*

Dr. Jason does not explain *why* a minimum of nine members rather than a maximum of eight members in the two subject Oxford Houses would result in the advantages to the residents he reports. Where, as here, Oxford House insists it needs nine, not eight, residents at each of the Camden and Market Street houses, the rationale for its selecting that minimum number is an especially critical factor to the court in analyzing the "necessity" for the requested accommodation. No such rationale has been offered. *See Smithers v. City of Corpus Christi,* No. CC-06-133 (S.D. Tex. March 19, 2008) (observing that although "the Court does not deny that group living has therapeutic value, [plaintiff] failed to produce any evidence that a group of eighteen to twenty people in a single home constitutes a critical mass for effective recovery from addiction. . . .").

The bare opinion that nine residents are "necessary" to the successful operation of

19

Oxford Houses is not helpful without some explanation *why* nine, but not eight, are "necessary."
In fact, Oxford House's position as to the minimum number of residents per house appears to
vary. For example, Oxford House argued in *Oxford House, Inc. v. City of Albany*, 819 F. Supp.
1168, 1176 (N.D.N.Y. 1993) that its residents' handicaps required them to live in close proximity
in groups of *six* or more to provide the necessary moral support and counseling during their
road to recovery. Dr. Jason opined in *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th
Cir. 1996), that *eight* residents can provide "significant therapeutic benefits" for Oxford House
members.

Here, as in *Bryant Woods*, Oxford House simply asserts that it "needs" to house more
residents than it currently does. Here, however, while the supposed critical minimum number
is only one more than the present status quo, it bumps the facilities into a different category
which is not permitted in single family residential neighborhoods *at all*. Again, nothing in the
record suggests *why* the additional resident is required. Indeed, Oxford House acknowledges
the Fourth Circuit Court of Appeals' observation that, "[i]f Bryant Woods Inn's position were
taken to its limit, it would be entitled to . . . hous[e] 75 residents, on the rationale that the
residents had handicaps." *Bryant Woods*, 124 F.3d at 605 (cited by Oxford House in its
Memorandum [DE-23] at p. 18). Oxford House contends that Bryant Woods is distinguishable
in this respect in that here, Oxford House "presented considerable undisputed and specific
evidence of why the requested accommodation is 'necessary' for therapeutic reasons." Plaintiffs'
Memorandum at p. 18. The undersigned has not yet located that "considerable undisputed and
specific evidence" in this record why nine, rather than eight, residents are necessary for
"therapeutic reasons."

Nor is there any evidence that the Camden and Market Street Oxford Houses are failing
or even floundering financially or therapeutically because each houses only eight and not nine,
10 or 12 men. The only "financial viability" advantage of a greater number of residents

20

mentioned by Dr. Jason is the obvious smaller per-resident share of the costs. Of course, that fact would hold true for any number of any population of persons pooling resources to cover communal living expenses. *See Hemisphere Bldg. Co., Inc., v. Village of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (observing that the FHA bars discrimination against "handicapped people by reason of their handicap, rather than . . . by virtue of what they have in common with other people, such as a limited amount of money to spend on housing").

Dr. Jason's report suggests no special nexus between the disability shared by drug addicts and alcoholics and the necessity that each be responsible for a smaller share of expenses. *See Bryant Woods*, 124 F.3d at 597 (commenting that "if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary' "). Jason's report contains no prediction of rising costs or rents that might necessitate an additional source of income to meet common expenses; in fact, Oxford House has offered no evidence at all concerning any fiscal aspect of the subject homes. At the public hearings, Oxford House's attorney avoided questions and deflected citizens' comments concerning their understanding of Oxford House residents' costs in light of otherwise very modest property values in the neighborhoods. Oxford House's position is that because of its non-profit status, property values and income from rents are matters irrelevant to its application for a text amendment.

The court recognizes that Oxford House is a "not for profit" organization. However, it is not the sole plaintiff. Indeed, based on the "evidence" of record, the only fiscal impact an additional resident or two would have on the Camden and Market Street Oxford Houses' "financial viability" would be an increase in rental income to the common landlord, plaintiff Harold Laing, whose interests may not be entirely altruistic.

Most telling with regard to Oxford House's burden to show "necessity" i[s Mr. Heafner's response to a Planning Commissioner's question, "In your opinion, how many individuals

21

presently go unserved in Wilmington"? Exhibit E, p. 13-14. Mr. Heafner responded, "I honestly don't know. . . . [T]he Oxford House worker] could probably tell you how many calls they get on the average a month or so; you know, Do you have a vacancy?" That might be some indication at least, but I don't know the answer that you're asking [sic]." *Id.* p. 14. When asked what would happen to the 16 present residents of the two facilities, Mr. Heafner offered his personal opinion.

> Those two homes, my experience with the occasional times that homes have had to – and [the Oxford House worker] could probably tell you with more detail – some of those 16 people who are probably new to sobriety, new residents, would probably go and live somewhere else and probably return to using the drugs or alcohol that they did and may end up in your jail or breaking into your neighbor's house. Most of them though, hopefully, would either be absorbed into other Oxford Houses that had vacancies or move somewhere else on their own. Bust some of them – it's been Oxford House's experience that out of ten maybe one relapses and doesn't make it.

Exhibit E, p. 14-15. The Oxford House worker did not, in fact, provide detail, and the factual basis for Mr. Heafner's observations is not a matter of record.

In short, Oxford House has not forecast the nature, quality or quantity of "evidence" supporting its "necessity" argument that would satisfy its burden of proof. The record is devoid of any competent evidence that an accommodation to permit more than eight residents is "necessary," as that term is used in this context.

(2) "Reasonableness"

Contrary to the rule of law that controls resolution of this case, Oxford House insists that the City must lose because the City has failed to demonstrate that Oxford House's requested accommodation is "unreasonable." Again, throughout its arguments, Oxford House reassigns the burden of proof to the City in direct contradiction to the Fourth Circuit's directive in *Bryant Woods*, which explicitly places that burden on the plaintiff. *See Bryant Woods*, 124 F.3d at 604. It is Oxford House, like *Bryant Woods*, that has "failed as a matter of law, to establish in this case that its requested accommodation is reasonable." *Id.* at 604-05.

22

The gravamen of Oxford House's position that its text amendment is "reasonable" is that the two group homes have continuously been in operation for more than a decade with nine or more residents with no cost to the City, and that adopting the text amendment in no way would effect a fundamental alteration in the City's zoning scheme. The impression conveyed by Oxford House's attorney, Mr. Heafner during his presentations to both the Planning Commission and the City Council was that these Oxford House facilities had been legal uses before enactment in 2003 of the LDC. For example, he told the Planning Commission:

> There's –I don't know how much information you have with the prior history of litigation. I understand you have a summary. I haven't seen that. But Oxford House has made several attempts to come into compliance. These two homes were here long before this code was enacted that applied to group homes.

Exhibit E, p. 7; *see also id.* pp. 9-10, 39.

At the public hearing before the City Council on January 9, 2007, Mr. Heafner told the Council members and attendees that both OH-Camden's and OH-Market's operations "pre-dated" the LDC "by a long time," and that upon enactment of the LDC, the homes reduced their occupancy limits in compliance:

> And in fact, prior to the code that we're seeking to amend, these Oxford Houses did operate with, I believe, ten residents apiece.
>
> They dropped down to eight when the code – when the group home ordinance was adopted by the city about three years ago. And this amendment would allow them to return to the level of nine or ten at its most desirable.
>
> And the fact that they have been there for over a decade is proof that they're not going to fundamentally alter the city zoning scheme or the neighborhoods that they're in.

Exhibit H, p. 7; *see also* Exhibit E, p.13. Neither house applied for, or ever was granted, a certificate of occupancy. In fact, the City Attorney observed, *inter alia*, "The Oxford House Market Street and Camden Circle are not legally permitted and never have been legal in the city of Wilmington. When they established themselves, they did not come in for the special use

23

permit, so they never received one. Other group homes around them have come into compliance, have opened homes, and have their operating permits, Oxford House does not." *Id.* p. 22.

Oxford House's only "evidence," – Dr. Jason's report – does not address any factors pertinent to a determination of the "reasonableness" of the requested accommodation, presumably because Oxford House insists that it is the City's burden to prove unreasonableness. Rather, the gravamen of Oxford House's position is that continued operation of both the Camden and the Market Street Oxford Houses *must* be "reasonable," because both houses have operated in violation of municipal codes and ordinances without being shut down for more than a decade. Oxford House fails to acknowledge that the City has, by agreement, foregone enforcement of its municipal zoning code during the lengthy pendency of this litigation.

The illegality of the Oxford Houses' operations at their present location does not render their requested accommodations *per se* unreasonable. But neither does the fact that the Houses have managed to evade enforcement of the City's zoning regulations for so long prove that the custom-crafted accommodation is *per se* reasonable. To hold otherwise would encourage organizers of group homes to establish such homes without attempting to comply with local zoning ordinances or the process for seeking an accommodation, in the hopes of evading enforcement "long enough" to show that the use is "reasonable."[8]

---

[8] Again, Oxford House in some instances has been known to have "adopted a rather high-handed policy: 'As a matter of practice, Oxford House, Inc. does not seek prior approval of zoning regulations before moving into a residential neighborhood.' " *Village of Palatine*, 37 F.3d at 1235 (Manion, J. concurring).

Reversing a district court's award of attorney's fees to Oxford House, the Eighth Circuit Court of Appeals reasoned,

Oxford House argues that its lawsuit was necessary to stop the City from intentionally discriminating against residents by threatening them with eviction. There are two obvious answers to this contention. First, it is premised upon a self-inflicted wound. Oxford House signed a lease, moved two residents into the

24

Oxford House states, "[a]gain looking to *Bryant Woods*, the City must point to specific

facts that demonstrate that the requested accommodation would impose unreasonable burdens

on the City or neighborhood that would actually and predictably affect the surrounding

neighborhood." Plaintiffs' Memorandum [DE-23] at p. 22. Besides again applying the incorrect

burden of proof, Oxford House completely disregards statistical and anecdotal evidence offered

by the City at both municipal hearings.

For instance, the uncontroverted evidence of record is that both group homes house

more than twice the average number of occupants per residence in their respective

neighborhoods, and, according to the evidence of record, both generate considerably more

traffic and parking issues than their neighbors, as well as attention from the law enforcement

community.

An exchange between a Planning Commission member and Mr. Heafner at the public

hearing on December 6, 2006, sheds some light on Oxford House's efforts to demonstrate the

reasonableness of its proposed text amendment:

| Commissioner: | These two houses were found to be out of compliance and the lottery was drawn and they happened to lose, and that was back three and a half years ago, right? |
|---|---|
| Mr. Heafner: | Correct. |
| Commissioner: | Can you tell me what – why you've had no success in finding new |

home without obtaining an occupancy permit, and declared its intent to violate
the zoning ordinance by moving a total of ten unrelated residents into the home.
Apparently, this is part of a nationwide Oxford House strategy to ignore local
laws that treat its residents differently than members of a biological family, and
to present local zoning officials with a *fait accompli* by moving into a residential
neighborhood without seeking prior approval. Having provoked the City into
taking action to enforce its facially neutral laws, Oxford House cannot bootstrap
itself into a prevailing party because the City later granted an administrative
accommodation when Oxford House eventually sought it.

*City of University City*, 87 F.3d at 1025 (citing *Village of Palatine*, 37 F.3d at 1234-35 (Manion,
J. concurring) (footnote omitted)).

25

|                | residences during that period of time? You've had three and a half years to do it. |
|----------------|-------------------------------------------------------------------------------------|
| Mr. Heafner:   | You're asking me why Oxford House didn't just decide to close those two houses down at some point as they lost decisions before board or whatever and just "let's go find some place to move"? Is that what you're asking? |
| Commissioner:  | I think that was the intent of the ruling when the lottery – when you didn't win the lottery; then it was close or find another place, and you chose to stay there and sort of fight it, and -- |
| Mr. Heafner:   | Right. |
| Commissioner:  | – commend you for that. However, have you been searching for other places and what sort of obstacles have you found in your search? |
| Mr. Heafner:   | To my understanding, I can't say for sure. I don't believe that Oxford House has searched for other places. They – prior to the lottery, they closed one house, then absorbed those residents which is as much as they could do. |

Exhibit E, pp. 16-17. Mr. Heafner went on to explain that Oxford House could not have broken the leases without incurring a penalty, and therefore decided to exercise its rights. *Id.* p 17.

While Oxford House most assuredly is within its rights to challenge the City's denial of its proposed text amendment, it cannot prevail in this action because it has not carried its burden of proof. The transcripts of the public hearings conducted by the municipal tribunals contain the statements of citizen after citizen expressing respect and support for Oxford House's mission but explaining in very real terms how and why Oxford House's persistent violation of city zoning codes and ordinances adversely has impacted their quality of life in the respective "single-family neighborhoods." The record speaks most eloquently for itself. In contrast, the party with the burden of proof has offered no evidence to support its theory that, since its two homes have been operating (illegally) for over a decade, it is reasonable for them to continue to operate in their Camden and Market Street locations in violation of the half-mile separation requirement, only with *more* residents.

26

## IV. Conclusion

Oxford House understandably argues from a narrow perspective – that of an organization that receives state funding through federal block grants to organize group housing in a rehabilitative environment for a specific classification of "disabled" individuals protected by the FHA. Congress has determined that this class of persons needs legislative protection from discrimination in obtaining equal housing opportunities. The Oxford House model is successful and has enabled hundreds of recovering alcoholics and drug addicts to assimilate back into their communities.

The City, which also is interested in the services Oxford House provides, must approach Oxford House's request for accommodation from a far more comprehensive perspective, in this context represented by the LDC, which was enacted after extended study and multiple public hearings. Municipal zoning laws must weigh the rights and freedoms of its individual citizens against the concerns of all that combine synergistically to require a delicate balance of the physical, aesthetic, safety, environmental, fiscal, and health aspects of organized community. "Although the procedures of a zoning board may limit an application for a permit to one particular use, it has been said that the board cannot, in a proper and reasonable discharge of its function, ignore the total picture, of which it has personal knowledge, and act on a piecemeal basis." MCQUILLIN, 25 THE LAW OF MUNICIPAL CORPORATIONS § 179.39 (3d ed. 2010) (citation omitted). For these reasons, a request to alter that balance must be supported by a preponderance of the evidence, according to controlling law.

Here, that controlling law, *Bryant Woods*, places the burden squarely on Oxford House, which simply has not offered a preponderance of the evidence to show that recovering alcoholics and drug addicts in Wilmington require the proposed accommodation in order for them "to obtain equal opportunity to use and enjoy housing." While there may be no genuine issues of material fact between the parties, the party to which the burden of proof has been

27

assigned has not demonstrated that it can produce competent evidence of each element of its claim that the City has violated the FHA.

For the reasons stated herein, together with those additional reasons cogently set forth in the City's memoranda submitted in support of its position, the City's Motion for Summary Judgment [DE-20] is ALLOWED and Oxford House's Motion for Summary Judgment [DE-22] is DENIED. The Clerk of Court is DIRECTED to enter judgment in favor of the City of Wilmington, and to remove this matter from the court's trial and pretrial calendars. The City's Motion to Continue [DE-76] is DENIED as moot.

SO ORDERED.

This, the _25_ day of October, 2010.

_James C. Fox_
JAMES C. FOX
Senior United States District Judge